KAB

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Candelario H. Ramirez,<br><br>Plaintiff,<br><br>v.<br><br>Charles L. Ryan, et al.,<br><br>Defendants. | No. CV 16-04305-PHX-DGC (BSB)<br><br>**ORDER** |

Plaintiff Candelario H. Ramirez, who was formerly in the custody of the Arizona Department of Corrections (ADC), brought this civil rights action pursuant to 42 U.S.C. § 1983. (Doc. 5.) Defendants move for summary judgment. The Court provided notice to Plaintiff pursuant to *Rand v. Rowland*, 154 F.3d 952, 962 (9th Cir. 1998) (en banc) regarding the requirements of a response (Doc. 27), but Plaintiff did not file a response.

**I.    Background**

In his First Amended Complaint, Plaintiff alleged as follows. On February 15, 2015, Plaintiff went to medical complaining that his jaw was broken. (Doc. 5 at 5.) Dr. Dinkha, the dentist, recommended that Plaintiff be sent to Desert Valley Oral Surgery for repair of a left mandible fracture in his jaw. (*Id.*) On February 19, 2015, Plaintiff went to Desert Valley Oral Surgery and his jaw was wired shut. (*Id.*) Plaintiff thought the wires were too loose, reported this to Dr. Dinkha, and she stated that Plaintiff would be seen in a few weeks. (*Id.*) Because Plaintiff's jaw was wired incorrectly, he developed an abscess and experienced excruciating pain. (*Id.*) Plaintiff repeatedly requested to be seen

by a doctor over the next few weeks as the abscess grew to the size of a tennis ball, became infected, and began to leak puss. (*Id.*) Plaintiff began to refuse his insulin because he believed this refusal would result in medical care to his jaw. (*Id.* at 6.)

On March 12, 2015, Plaintiff was called in to see a dentist. (*Id.* at 6-7.) On March 16, 2015, a different dentist decided to send Plaintiff for emergency treatment. (*Id.* at 7.) On March 20, 2015, Plaintiff was transferred to Banner Health Hospital and underwent emergency oral surgery. (*Id.* at 8.) Plaintiff was then hospitalized at ADC-Florence in a medical unit, where he received treatment for an extended period. (*Id.*)

In May of 2016, Plaintiff submitted an HNR requesting treatment for recurring urgent dental problems, abscess, infection, and pain and suffering. (*Id.* at 9.) In June of 2016, Plaintiff lost consciousness and was sent to "emergency" as a result of continued lack of timely dental treatment. (*Id.* at 8-9.) Plaintiff alleged that he received constitutionally inadequate medical care and delays in treatment of his dental problems due to policies, practices, or customs instituted by Defendants Ryan and Pratt. (*Id.*)[1]

On screening under 28 U.S.C. § 1915A(a), the Court determined that Plaintiff stated Eighth Amendment claims based on deliberate indifference to serious medical needs against Defendants Ryan and Pratt. (Doc. 6.) The Court dismissed the remaining claims and Defendants. (*Id.*)

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

---

[1] Plaintiff was released from ADC custody in April 2017. (Doc. 26 ¶ 3.)

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Co., Inc.*, 210 F.3d 1099, 1102-03 (9th Cir. 2000). But if the movant meets its initial responsibility, the burden shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material (a fact that might affect the outcome of the suit under the governing law) and that the dispute is genuine (the evidence is such that a reasonable jury could return a verdict for the nonmovant). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968), but he must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. The court must believe the nonmovant's evidence and draw all inferences in his favor. *Id.* at 255. The court need consider only cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3).

**III. Facts**

Because Plaintiff did not file a response to the Motion for Summary Judgment, the Court will construe Plaintiff's verified First Amended Complaint as an affidavit in opposition to the summary judgment motion. *See Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (allegations in a pro se plaintiff's verified pleadings must be considered as evidence in opposition to summary judgment); *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995) (verified complaint may be used as an affidavit opposing summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence). But to the extent Plaintiff failed to controvert Defendant's facts in his First Amended Complaint, the Court will assume those facts are uncontroverted for the

purposes of this Order. *Heinemann v. Satterberg*, 731 F.3d 914, 917 (9th Cir. 2013) (If a summary judgment motion is unopposed, Rule 56 "authorizes the court to consider a fact as undisputed.").

On February 16, 2015, Plaintiff was seen by Nurse Practitioner (NP) Smith for pain in his jaw. Plaintiff reported that he was in a fight the day before and that his jaw felt broken. (Doc. 26 ¶ 7.) Plaintiff could open his mouth, but was unable to chew, and an x-ray was consistent with a mandible fracture. (*Id.* ¶ 7.) Plaintiff was scheduled to see dental the next day. (*Id.*) On February 17, 2015, Plaintiff was seen by Rommel Dinkha, DDS, who noted that Plaintiff's occlusion was off and that he had a linear laceration between teeth #22 and #23 extending from the buccal to the floor of the mouth lingually; Plaintiff reported pain at 10/10, a soft diet was recommended, medications were provided, and Plaintiff was to be seen ASAP. (*Id.* ¶ 8.) On February 19, 2015, Plaintiff was seen offsite at Desert Valley Oral Surgery and had surgery for his left mandible fracture. (*Id.* ¶ 9.) Plaintiff had a closed reduction and arch bars were placed in Plaintiff's mouth; Plaintiff was to wear the arch bars for eight weeks and return for evaluation. (*Id.*) The doctor noted that if the arch bars were to come off, it was critical that Plaintiff be scheduled for replacement of the arch bars. (*Id.*) Plaintiff was placed on a liquid diet for eight weeks, given antibiotic medications for fourteen days, and prescribed oral rinses twice daily. (*Id.*)

On February 20, 2015, Plaintiff was seen for follow up by David Lewis, DDS in the dental clinic. Lewis approved the surgeon's notes and approved recommendations for a liquid diet, antibiotics, pain medications, and the eight-week follow-up. (*Id* .¶ 10.) On March 12, 2015, Plaintiff was seen in the dental clinic by Dr. Williams, DDS because nursing informed Dr. Williams that Plaintiff's arch bars had been removed. (*Id.* ¶ 11.) Plaintiff complained that the majority of his arch bars were loose and that he had removed the rest himself. He also reported a lump under his chin and stated that the surgery was not done correctly. (*Id.*) Plaintiff's oral cavity was irrigated and Dr. Williams told Plaintiff that she would discuss the situation with her supervisor and

1 | follow-up with him the next day. (*Id.*)

2 | On March 13, 2013, Dr. Williams consulted with Dr. Gray, who gave instructions to send Plaintiff out STAT to the treating oral surgeon at Desert Valley Queen Creek. Dr. Gray stated that Plaintiff should be informed that if he removed his wires again or was non-compliant with dental/oral surgery orders, no additional cost or treatment would be incurred. (*Id.* ¶ 12.) Plaintiff signed this note. (*Id.*)

On March 19, 2015, Plaintiff underwent oral surgery at Banner Good Samaritan Hospital consisting of osteotomy and malunion of mandibular fracture and incision and drainage of abscess. Plaintiff was released from the hospital on March 29, 2015. (*Id.* ¶¶ 14-15.)

On March 30, 2015, Plaintiff was seen by Dr. Vukcevic in the infirmary, who noted that the mandible incision was healing well. (*Id.* ¶ 16.) On April 2, 2015, Plaintiff was seen by Dr. Lines, DDS, who noted that Plaintiff did not have any rubber bands in his mouth, though there were rubber bands at his bedside. Dr. Lines placed rubber bands in Plaintiff's mouth and told Plaintiff to speak only when necessary. (*Id.* ¶ 17.) Dr. Lines noted that Plaintiff appeared to be healing normally. (*Id.*) On April 3, 2015, Plaintiff was again advised by nursing staff to keep his rubber bands on and his jaw still. (*Id.* ¶ 18.) On April 7, 2015, Plaintiff was seen by Dr. Lines, who noted that Plaintiff broke all his rubber bands since the last visit. Plaintiff reported more pain and that the pain medications were less effective. (*Id.* ¶ 19.) Dr. Lines diagnosed Plaintiff with possible candidiasis on gingiva, otherwise healing normally, ordered more rubber bands, and requested an off-site visit. Plaintiff's pain medications and antibiotic were continued. (*Id.*) On April 8, 2015, Plaintiff was seen for assessment of acute osteomyelitis of mandible following osteotomy, debridement, and reconstruction of mandible as well as incision and drainage of abscess. Plaintiff was discharged with instructions to irrigate his mouth with Chlorhexidine mouth rinse. (*Id.* ¶ 20.) On April 15, 2015, Plaintiff was seen by Dr. Lines, who noted that Plaintiff's buccal mucosa on lower left anterior was pink and that Plaintiff was receiving adequate pain medications. (*Id.* ¶ 21.)

On May 13, 2015, Plaintiff saw Dr. Johnson, who discussed weaning narcotics with Plaintiff. Plaintiff stated his pain was well-controlled and Dr. Johnson discharged Plaintiff from the infirmary. (*Id.* ¶¶ 22-23.) On June 17, 2015, Plaintiff's arch bars were removed. (*Id.* ¶ 24.) On June 18, 2015, Plaintiff was seen by Dr. Smith in the Dental Clinic, who noted "All external oral fixation devices have been removed; visible oral tissues well healed/scarred; no discomfort and stable occlusion." (*Id.* ¶ 25.) On July 6, 2015, Plaintiff was told he could resume his regular diet and was given exercises to perform. NP Lyons requested an occlusal guard from dental if able. (*Id.* ¶ 27.) On July 8, 2015, Plaintiff was evaluated for the occlusal guard. (*Id.* ¶ 28.) On August 9 and 25, 2015, Plaintiff submitted Health Needs Requests (HNRs) stating that he was in pain from his jaw injury. (*Id.* ¶ 29.)

On August 27, 2015, Plaintiff was seen in the dental urgent care clinic, where the doctor noted that Plaintiff was complaining of pain, that he had not yet received an occlusal guard, and that his "mandibular fx looks to be closed, healing. Nothing obviously unusual with the mandibular bone other than the fixation bars." The doctor noted that she would request an occlusal guard and seek a consult with the Banner operating surgeon. (*Id.* ¶ 31.) On September 4, 2015, Plaintiff was seen in dental to obtain impressions for his occlusal guard. The doctor noted that Plaintiff's mandible continued to heal well and that he was approved for an occlusal guard. (*Id.* ¶ 32.) On October 23, 2015, Plaintiff submitted an HNR complaining of intolerable pain from his jaw injury. (*Id.* ¶ 33.) On October 28, 2015, Plaintiff was seen in the Dental Urgent Care. The doctor noted that Plaintiff was complaining of pain in tooth #19 and that a filling in that tooth was necessary. The doctor gave Plaintiff a temporary filling. (*Id.* ¶ 34.) On November 22, 2015, Plaintiff submitted an HNR requesting fillings and a cleaning. (*Id.* ¶ 35.)

On January 6, 2016, Plaintiff was seen for a dental call back for delivery of his night guard. Plaintiff complained of pain in his upper right tooth #5, and the doctor recommended extraction. Plaintiff agreed to the extraction and Dr. Harling extracted the

tooth and delivered Plaintiff's night guard. (*Id.* ¶ 36.) On February 25, 2016, Plaintiff was seen for routine dental treatment. (*Id.* ¶ 37.) On April 29 and May 2, 2016, Plaintiff submitted HNRs stating that he has pain when he eats. (*Id.* ¶¶ 38-39.) On May 10, 2016, Plaintiff was seen in the Dental Urgent Care and said he could not eat on his left side. An x-ray was taken, and Dr. Wright referred Plaintiff for follow-up at Banner for evaluation of possible extraction of tooth #22 and any additional treatment. (*Id.* ¶ 40.)

On May 31, 2016, Plaintiff was seen at Banner Health, where the doctor noted no swelling or signs of mandibular hardware failure, but that Plaintiff was having pain lingual to tooth #18 and #19 and buccal to tooth #22. The doctor noted that without 3D imaging it was difficult to determine if it was a dental problem or related to failing mandibular hardware. The doctor ordered a maxillofacial CT without contrast to determine the cause of Plaintiff's pain. (*Id.* ¶ 41.) On June 6, 12, and 14, 2016, Plaintiff submitted HNRs complaining of extreme pain. (*Id.* ¶¶42-44.) On June 15, 2016, Plaintiff was seen by a registered nurse (RN) with complaints of extreme weakness and dizziness. The nurse documented swelling on the right jaw down to the neck and tenderness when palpating the neck and Plaintiff complained of pain when swallowing. Plaintiff was sent to Florence Hospital. (*Id.* ¶ 45.) At Florence Hospital, the doctor gave Plaintiff a nerve block in the left mandible region and incision and draining of an abscess of the left buccal mucosa. Plaintiff was discharged with broad-spectrum antibiotics, continuous warm salt water rinses, and non-steroidal anti-inflammatories to control his pain. (*Id.* ¶ 46.)

On June 16, 2016, Plaintiff was seen by an RN, who noted that the lower left jaw area was tender to touch and swollen, but no redness or streaking and no warmth to the area. Plaintiff's oral mucosa were pink and moist with no active draining or bleeding noted and no loose teeth. (*Id.* ¶ 47.) On June 26, 2016, Plaintiff submitted an HNR stating that his abscess had not subsided and that he needed more pain medication. (*Id.* ¶ 48.) On June 28, 2016, Plaintiff was seen by Larry Russell, DDS, who prescribed a different antibiotic and recommended a consult with the offsite provider concerning the

healing of the mandible/fracture surgery and whether extraction was contraindicated. (*Id.* ¶ 49.) That same day, the results of Plaintiff's CT Maxillofacial were reviewed. The Findings/Impression suggested "clinical correlation and if clinically warranted, nuclear medicine triple phase bone scan" to provide additional information. Plaintiff was sent to AZ Tech Radiology for the tests. (*Id.* ¶ 50.) On June 30, 2016, Plaintiff submitted another HNR complaining of pain, and on July 1, 2016, Plaintiff refused his insulin because he wanted to be seen by dental. (*Id.* ¶¶ 51-52.)

On July 15, 2016, Plaintiff was seen by a nurse with complaints of pain, shivering, dizziness, and statements that his abscess was back. The nurse documented that Plaintiff's left lower cheek was swollen and tender to the touch and his gums were red and swollen. (*Id.* ¶ 53.) Plaintiff was given Toradol, 30 mg., Phenergan, and transported to Mountain Vista Hospital for IV antibiotics and pain medications for tooth abscess. (*Id.* ¶ 53.) At the hospital, Plaintiff was started on antibiotics and scheduled for debridement of the mandible. (*Id.* ¶ 54.) On July 18, 2016, Dr. Faibisoff performed surgery for removal of buried hardware and removal of teeth #18 and #19, with drainage of periodontal abscess. (*Id.* ¶ 55.) On July 19, 2016, Plaintiff was seen in dental and given the medications recommended by the oral surgeon. (*Id.* ¶ 56.) On July 21, 2016, Plaintiff was seen for an urgent dental care appointment. The doctor noted that Plaintiff's gums were slightly inflamed with no redness and Plaintiff was scheduled for re-evaluation on the 28th. (*Id.* ¶ 57.) On July 22, 2016, Plaintiff was seen by LPN Viridiana for complaints that his stiches were coming out and his lip was not attached to his gums. Plaintiff was transferred to the hospital. (*Id.* ¶ 58.)

On July 23, 2016, Plaintiff returned from the hospital and complained that the hospital did not help him and he was in pain. The nurse noted some improvement. The on-call provider prescribed Tylenol #3, continuation of Clinadmycin, salt water rinses, Ensure BID, a liquid diet, and told the nurse to fax hospital paperwork "for plastic surgeon f/up." (*Id.* ¶ 59.) On July 25 and 26, 2016, Plaintiff submitted HNRs stating that all of his stiches had fallen out and that the Tylenol was not controlling his pain. (*Id.*

1  ¶¶ 60-61.) On July 26, 2016, Plaintiff was seen in the Urgent Care. The doctor requested emergency oral surgery. (*Id.* ¶ 62.) On August 3, 2016, Plaintiff was again seen in the dental clinic, and it was noted that Plaintiff had been sent off-site for oral surgery, but that the visit was preempted by an emergency at the oral surgeon's office. Plaintiff was rescheduled for surgery. (*Id.* ¶ 64.) On August 5, 2016, Plaintiff was seen for a dental follow-up. The doctor recommended a follow-up with the doctor at Banner and noted that Plaintiff had no infection. (*Id.* ¶ 65.) Also on August 5, 2016, Plaintiff was seen by Dr. Faibisoff, who noted that the wound was gradually healing, was clean, and there was no infection. (*Id.* ¶ 66.) On August 10, 2016, Plaintiff was seen for suture removal of the lower anterior vestibule. Plaintiff reported that he was much better and no longer in pain. (*Id.* ¶ 67.) The doctor noted that the sutures were intact with no edema, and told Plaintiff he would have to be sent to an oral surgeon for treatment. (*Id.* ¶ 67.)

On August 23, 2016, Plaintiff was seen by the doctor at Banner, who noted that Plaintiff's acute osteomyelitis was resolved, and a CT was taken. (*Id.* ¶ 68.) The same day, Plaintiff was seen by nursing, who noted a follow-up in four to six weeks if Plaintiff still had an open wound. (*Id.* ¶ 69.) On November 6, 2016, Plaintiff submitted an HNR stating that his jaw was starting to hurt again when he eats. (*Id.* ¶ 70.) On November 8, 2016, Plaintiff was seen by a doctor, who assessed that Plaintiff probably had nerve damage to tooth #22. (*Id.* ¶ 71.)

Defendant Ryan, the Director of the ADC, delegated his duty to review grievance appeals to Jeff Hood, who responded to two of Plaintiff's grievances on October 4 and October 30, 2015. (*Id.* ¶ 82.) Plaintiff sent an Inmate Letter to Director Ryan dated October 23, 2015, which was responded to by Connie Hawley, LPN. (*Id.* ¶¶ 85-86.) Defendant Pratt is the Assistant Director of ADC's Health Services Contract Monitoring Bureau (HSCMB) and did not have any involvement in Plaintiff's care. (*Id.* ¶¶ 90-96.)

**IV. Discussion**

Under the Eighth Amendment standard, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).) There are two prongs to the deliberate-indifference analysis: an objective standard and a subjective standard. First, a prisoner must show a "serious medical need." *Jett*, 439 F.3d at 1096 (citations omitted.) A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted.)

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they deny, delay, or intentionally interfere with medical treatment." *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (internal citations and quotation marks omitted.) Deliberate indifference may also be shown by the way in which prison officials provide medical care, *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988), or "by circumstantial evidence when the facts are sufficient to demonstrate that a defendant actually knew of a risk of harm." *Lolli v. County of Orange*, 351 F.3d 410, 421 (9th Cir. 2003.) Deliberate indifference may also be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096.

But the deliberate-indifference doctrine is limited. An inadvertent failure to provide adequate medical care or negligence in diagnosing or treating a medical condition does not support an Eighth Amendment claim. *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (citations omitted.) Further, a mere difference in medical opinion does not establish deliberate indifference. *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

1 | Moreover, in a case like this, to prove a claim based on a policy, practice or custom of Defendant, Plaintiff must provide evidence showing (1) that his Eighth Amendment rights were violated by an employee or employees of the Defendant; (2) that the Defendant has customs or policies that amount to deliberate indifference; and (3) that the policies or customs were the moving force behind the violation of Plaintiff's constitutional rights in the sense that the Defendant could have prevented the violation with an appropriate policy. *See Gibson v. County of Washoe*, 290 F.3d 1175, 1193-94 (9th Cir. 2002). "Policies of omission regarding the supervision of employees . . . can be policies or customs that create . . . liability . . . , but only if the omission reflects a deliberate or conscious choice to countenance the possibility of a constitutional violation." *Id.* at 1194 (quotations omitted).

Plaintiff does not produce any evidence that he was denied or delayed treatment due to any policy, practice, or custom by Defendants Ryan and Pratt or due to the lack of a policy. In his First Amended Complaint, Plaintiff primarily complains that he did not receive adequate treatment between February 19, 2015 and March 12, 2015, but the medical records show that Plaintiff was scheduled for follow-up in eight weeks following his surgery. There is no evidence in this record that not having a follow-up for eight weeks was the result of deliberate indifference to Plaintiff's serious medical needs or was the result of a policy, practice, or custom of the Defendants. Likewise, Plaintiff alleges in his First Amended Complaint that he experienced problems in May and June of 2016 due to lack of timely medical treatment, but Plaintiff's medical records and the evidence in the record do not support this assertion or that any delay in treatment was the result of a policy, practice, or custom promulgated by Defendants.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 25).

(2) Defendants' Motion for Summary Judgment (Doc. 25) is **granted**, and the action is terminated with prejudice. The Clerk of Court must enter judgment accordingly.

Dated this 30th day of April, 2018.

*David G. Campbell*
David G. Campbell
United States District Judge